**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-02102-NYW

LIBERTY MUTUAL INSURANCE COMPANY,

     Plaintiff,

     v.

MILENDER WHITE CONSTRUCTION COMPANY,
MW REAL ESTATE, LLC,
U.S. FACILITIES MANAGEMENT, LLC, and
MW SELFWORK, LLC,[1]

     Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

     This matter comes before the court on the Motion for Summary Judgment Against Third-Party Defendants ("Liberty's Motion for Summary Judgment") [#17], filed by Defendant/Third Party Plaintiff Liberty Mutual Insurance Company ("Liberty"), and the cross motion, titled Third Party Defendants' Motion for Summary Judgment ("MWCC's Motion for Summary Judgment") [#18], filed by Third Party Defendants Milender White Construction Co., MW Real Estate, LLC, U.S. Facilities Management, LLC and MW Selfwork, LLC (collectively, "MWCC"). The Motions are before the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c) and the Order of Reference dated September 14, 2017 [#35]. After carefully reviewing the Motions and related briefing, the entire case file, and the applicable case law, I DENY IN PART and GRANT

---

[1] The court directs the Clerk of the Court to revise the caption to reflect the Parties that remain in this action, and hereafter refers to "Liberty," "MWCC," and "Milender White" as defined herein, rather than by their original party designations.

IN PART Liberty's Motion for Summary Judgment and DENY IN PART and GRANT IN PART

MWCC's Motion for Summary Judgment.

## BACKGROUND

### The South Dakota Action

The history of this action is extensive and requires a detailed recitation. On January 9, 2015, Double H. Masonry, Inc. ("Double H. Masonry") sued Liberty and Lockton Companies, LLC in the Western Division of the United States District Court for the District of South Dakota, for breach of payment bond ("South Dakota Action").[2] [#1-1]. Jurisdiction was premised on diversity of citizenship pursuant to 28 U.S.C. § 1332. The dispute arose out of a subcontract between Milender White Construction Company ("Milender White") and Double H. Masonry to perform masonry work ("Subcontract"), pursuant to a prime contract between Milender White and the Oglala Sioux Tribe ("Prime Contract"), concerning the Tribe's Pine Ridge Justice Center located near Pine Ridge village, South Dakota  To secure the project, Milender White obtained a payment bond signed by its representative and a representative of Liberty, and which listed Lockton Companies, LLC as a surety (the "Payment Bond"). [*Id.* at 3]. The Payment Bond included the following relevant terms: Liberty was bound in the penal sum of $30,466,297 to any subcontractor that furnished labor, materials, or equipment for use in the performance of the Prime Contract; upon receipt of a written claim, Liberty would respond within sixty days identifying the undisputed amounts of the claim along with the disputed amounts and bases for dispute, and pay or arrange payment of the undisputed amounts; Milender White and the Oglala

---

[2] While recognizing that the pending matter is simply a continuation of a third-party complaint filed in the South Dakota Action, this court finds it helpful to distinguish between the two phases, specifically to recognize the orders that the District of South Dakota issued before it transferred the matter to this District.

Sioux Tribe would promptly furnish a copy of the Payment Bond upon request of any person who appeared to be a potential beneficiary of the bond; and Liberty would be liable for attorney fees incurred to recover sums found to be due and owing to a claimant. [*Id.* at 4]. As consideration for Liberty issuing the Bond and other bonds, and for other consideration, MWCC executed a General Agreement of Indemnity ("Indemnity Agreement").

Double H. Masonry ultimately initiated the South Dakota action to recover $848,755.61 it claimed was owed under the Payment Bond as a result of Milender White's failure to pay numerous invoices and failure to pay a damages award entered against it by the Oglala Sioux Tribal Employment Rights Office ("TERO"). [#3]. Liberty filed an Answer. [#1-12]. Milender White concurrently demanded Double H. Masonry participate in arbitration pursuant to terms of the Subcontract to resolve the payment disputes, and Liberty moved the court to stay the South Dakota Action pending the outcome of that arbitration. *See* [#1-16]. Before the court ruled, Double H. Masonry sought without opposition to amend its Complaint to, among other things, remove Lockton Companies, LLC, and to add claims for Contractual and/or Tortious Bad Faith and for Violation of Unfair Trade Practices Act; the court accepted the First Amended Complaint on May 26, 2015. *See* [#1-47]. Liberty thereafter moved to dismiss the pleading in part, [#1-51], and filed an Answer to the Amended Complaint. [#1-52]. Then, pursuant to the Parties' request, the court scheduled a settlement conference and held the motion to stay pending arbitration in abeyance to await the outcome of the settlement attempt. Settlement was unsuccessful. Two months later, on October 2, 2015, Double H. Masonry moved to amend its Complaint "to remove and acknowledge satisfaction of its TERO award claim," to omit reference to one of the previously unpaid invoices, and to remove its claim for Violation of Unfair Trade Practices Act.

[#1-83; #1-87].  Liberty thereafter filed an Answer, [#1-89], and the Parties asked the court to apply the previously-filed Motion to Dismiss as to the claim for Contractual and/or Tortious Bad Faith.

On November 4, 2015, the court granted Liberty's motion to stay pending resolution of the arbitration proceeding between Double H. Masonry and Milender White.  [#1-198].  Six months later, on April 14, 2016, Double H. Masonry moved the court to lift the stay, advising that the arbitrator had awarded it $320,778.57 and awarded Milender White $29,147.24, and that it intended to pursue attorney fees as to Liberty under the Payment Bond.  The court granted the motion and lifted the stay, and Double H. Masonry subsequently filed a motion for attorney fees and costs.  [#1-209].  On April 28, 2016, Double H. Masonry filed a motion for summary judgment on its claim for breach of payment bond.  [#1-217].  Liberty thereafter filed a motion for reconsideration of the order lifting the stay, which the court granted and thereby reinstated the stay pending the completion of the arbitration proceedings, which included allocation of costs and fees.  *See* [#1-240].

On August 1, 2016, Liberty filed a motion for leave to file a third party complaint against MWCC to assert a breach of the Indemnity Agreement, contending that Double H. Masonry's claims against Liberty "implicate [MWCC's] duty to defend and indemnify Liberty pursuant to the Agreement," and also implicate Milender White's common law duties to Liberty.  On August 5, 2016, Double H. Masonry filed a motion for amended attorney fees.  [#1-254].  Five days later, the court granted Liberty's motion, and accepted the Third Party Complaint.  [#1-279].  The Third Party Complaint is the operative pleading in the action between the Parties before this court, and is referenced hereafter as the Complaint.  *See* [#12].

4

Liberty's Complaint asserts the following claims: (1) Breach of Express Contract against All Indemnitors; (2) Common Law Indemnification against Milender White; (3) Injunctive Relief - Specific Performance Against All Indemnitors; (4) Injunctive Relief – *Quia Timet* Rights Against Milender White and All Indemnitors; and (5) Unjust Enrichment – Equitable Liens. [#12]. Liberty seeks the following relief: judgment for costs and fees incurred by it as a result of it issuing the Payment Bond; specific performance of the Agreement of Indemnity; injunctive relief requiring MWCC to place Liberty in sufficient funds to cover any possible liability for which MWCC will be obligated to indemnify Liberty per the terms of the Agreement of Indemnity; for an equitable lien in the amount of $235,000 placed in favor of Liberty on real property located in Arvada, Colorado owned by MWCC; and for a security interest in favor of Liberty on rights, title, and interest of assets belonging to MWCC. [*Id.* at 11]. On October 4, 2016, MWCC filed its Answer to the Complaint. [#1-314; #13].

In an order dated September 30, 2016, the District of South Dakota granted in part and denied in part Liberty's motion to dismiss. In a matter of first impression, the South Dakota court allowed Double H. Masonry's claim for tortious bad faith to proceed but dismissed Double H. Masonry's claim for contractual bad faith. [#1-312]. On October 13, 2016, Liberty filed a motion for summary judgment arguing essentially that Double H. Masonry sued Liberty prematurely, Double H. Masonry has been reimbursed for all damages it could have recovered under the Payment Bond, and there was in fact a good faith dispute between Double H. Masonry and Milender White. [#1-315; #1-370]. Double H. Masonry thereafter filed an unopposed motion asking the court to lift the stay, for permission to hold a Rule 26(f) conference, and that the court enter a scheduling order. The court granted the motion and lifted the stay, and MWCC

moved to join in Liberty's motion for summary judgment as to Double H. Masonry. [#1-337]. Thereafter, pursuant to the Parties' request, the court set a settlement conference to occur December 8, 2016. [#1-365]. On that date, Liberty and Double H. Masonry reached an agreement to settle their dispute.

The Pending Action

On February 6, 2017, Liberty filed this instant Motion for Summary Judgment against MWCC. *See* [1-373; #17]. Liberty moves for partial summary judgment as to its first claim for Breach of Contract on the basis that claims were made against Liberty by reason of Liberty having executed the Payment Bond. Liberty states that while it and MWCC had "justifiably disputed Double H's claim, losses were incurred," e.g., "Milender forced Double H to arbitrate its claims, and Milender lost." [#17 at 3]. Liberty argues that during its litigation against Double H. Masonry, it "made repeated demands on Milender and the Indemnitors for defense and indemnification for all of Liberty's losses"; "Milender and the Indemnitors failed and refused to make Liberty whole, as required by the plain language of the [I]ndemnity [A]greement"; and, "[a]s a matter of law, they are required to do so." [*Id.*] Liberty asserts that it incurred losses of at least $320,197 as a result of the alleged breach.

On February 27, 2017, MWCC filed its own pending Motion for Summary Judgment. [#1-378; #18]. MWCC moves for judgment as a matter of law that it has no obligation to indemnify Liberty against bad faith claims asserted by Double H. Masonry against Liberty. [#18]. MWCC contemporaneously filed a combined Response to Liberty's Statement of Material Facts and Statement of Material Facts in support of its Response and Cross Motion for Summary Judgment, [#1-379], and a combined Brief in support of its Response in opposition to

Liberty's Motion for Summary Judgment and in support of its Motion for Summary Judgment, [#1-380]. On March 24, 2017, Liberty filed a combined Response/Reply brief to MWCC's combined Brief in support of Response to and Motion for Summary Judgment. [#1-400]. On April 14, 2017, MWCC filed a Reply in support of its Cross Motion for Summary Judgment. [#1-407].

On February 28, 2017, MWCC filed a Motion to Realign Parties and Transfer Venue, asking the District of South Dakota to realign Liberty as Plaintiff and MWCC as Defendant and to transfer the action to this District. [#1-395]. MWCC argued that, with the claims between Double H. Masonry and Liberty resolved, the only claims left to be tried are Liberty's third-party claims against MWCC, and neither MWCC nor Liberty are citizens of or maintain their principal places of business in South Dakota. [*Id.*] Rather, MWCC argued, "Liberty's claims arise out of a written contract made in Colorado, events taking place in Colorado, and the witnesses relevant to those claims are located overwhelmingly in Colorado." [*Id.* at 3]. Liberty opposed the motion with respect to the request to transfer the action to Colorado. *See* [#1-403].

On March 2, 2017, Double H. Masonry and Liberty submitted a stipulation for dismissal, asking that Double H. Masonry's claims against Liberty be dismissed with prejudice without an award of attorney fees or costs to either Party. [#1-397]. The court subsequently dismissed those claims but retained jurisdiction over the parties' settlement agreement. [#1-398]. On April 14, 2017, the court granted MWCC's motion in part and realigned the parties, as is reflected by this court's caption. *See* [#1-406]. Four months later, on August 29, 2017, the court granted the

remainder of the relief MWCC sought, and ordered that the action be transferred to this District. [#1].[3]

Liberty is a Massachusetts corporation and maintains its principal place of business in that state. [#1-396 at 6 n.1]. The entities that comprise MWCC are Colorado corporations that maintain their principal places of business in Colorado. [*Id.* at 6]. The amount in controversy exceeds $75,000. *See* [#17 at 12]. Accordingly, this court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

## LEGAL STANDARD

A party may be entitled to summary judgment prior to trial if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.*, 210 F.3d

[3] The Motions for Summary Judgment and accompanying briefs do not comply with the Local Rules of this District, *see* D.C.COLO.LCivR 7.1(d) (providing that a motion shall not be included in a response or reply to the original motion) and they exceed the page limitations as set forth in the undersigned's Practice Standards. However, given the unique posture of the case, specifically that the Parties filed their Motions before the action was transferred, this court is not inclined to require the Parties to re-file and brief their arguments. Similarly, this court takes no position with respect to, and declines to address, the Parties' arguments regarding the proper application of the Local Rules of the District of South Dakota.

1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Service*, 812 F.2d 621, 623 (10th Cir. 1987). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Com*, 391 U.S. 253, 289 (1968)).

The burden of showing that no genuine issue of material fact exists is borne by the moving party. *Horizon/ CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). In reviewing a motion for summary judgment the court views all evidence in the light most favorable to the non-moving party. *See Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002). Where the moving party will bear the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *See Celotex Corp.*, 477 U.S. at 323. Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-movant "may not rest upon mere allegation or denials of [the] pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The court must resolve all doubts in favor of the existence of triable issues of fact. *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

Cross motions for summary judgment must be treated separately, and the denial of one does not require the grant of another. *Buell Cabinet v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). Rather, the court may enter summary judgment only if the moving party carries its burden of demonstrating that no genuine issue of material fact exists and that it is entitled to

judgment as a matter of law. *See Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002).

Thus, Liberty has the burden of demonstrating that no genuine issue of material fact exists with

respect to its argument that MWCC breached the Indemnity Agreement; and MWCC carries the

same burden to demonstrate that no genuine issue of material fact exists with respect to its

argument that the Indemnity Agreement does not require it to indemnify Liberty for bad faith

claims and Liberty is not entitled to common law indemnification.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

On May 25, 2012, Liberty issued the Payment Bond in the penal amount of $30,466,297

on behalf of Milender White, as principal, for preconstruction and construction services at the

Pine Ridge Justice Center Complex. [#17 at ¶ 1; #17-1; #1-379 at 4, ¶ 1]. As consideration for

Liberty issuing the Payment Bond and other bonds, and for other consideration, Milender White

and MW Real Estate, LLC, U.S. Facilities Management, LLC, and MW Selfwork, LLC (the

"Indemnitors") executed the Indemnity Agreement. [#17 at ¶ 2; #1-379 at 4, ¶ 2]. Pursuant to

the Indemnity Agreement, the Indemnitors agreed to:

> [E]xonerate, hold harmless, indemnify, and keep indemnified the Surety from and
> against any and all liability for losses, fees, costs, and expenses of whatsoever
> kind or nature including, but not limited to, pre- and post-judgment interest at the
> maximum rate permitted by law accruing from the date of a breach of this
> Agreement or a breach of any other written agreements between or for the benefit
> of the Surety and the Indemnitor(s) and/or Principal(s) (hereinafter referred to as
> "Other Agreements"), court costs, counsel fees, accounting, engineering and any
> other outside consulting fees and from and against any and all such losses, fees,
> costs and expenses which the Surety may sustain or incur: (1) by reason of being
> requested to execute or procure the execution of any Bond; or (2) by having
> executed or procured the execution of any Bond; or (3) by reason of the failure of
> the Indemnitors or Principals to perform or comply with any of the covenants and
> conditions of this Agreement or Other Agreements; or (4) in enforcing any of the
> covenants and conditions of this Agreement or Other Agreements. Payment by
> reason of the aforesaid causes shall be made to the Surety by the Indemnitors
> and/or Principals promptly, upon demand by the Surety, whether or not the Surety

shall have made any payment therefor and, at the Surety's sole option, irrespective of any deposit of collateral….In the event of any payment by the Surety, the Indemnitors and Principals further agree that in any accounting between the Surety and the Principals, or between the Surety and the Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement or Other Agreements under the belief that it is, or was, or might be liable for the sums and amounts so disbursed or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety. Surety shall have no obligation to invest or provide a return on any collateral provided to it under this Agreement.

[#17 at ¶ 3; #1-379 at 4, ¶ 3].

Double H. Masonry and MWCC became involved in a contract dispute over amounts Double H. Masonry claimed it was owed for both Subcontract and alleged additional work, and amounts for back charges that MWCC claimed against Double H. Masonry. [#1-379 at 5, ¶ 4; #1-400 at 6, ¶ 4]. On or about November 26, 2014, Double H. Masonry asserted a claim against the Payment Bond as to Liberty. [#17 at ¶ 4; #1-379 at 5, ¶ 5]. In January, 2015, Double H. Masonry filed suit against Liberty alleging that Liberty failed to pay under the Payment Bond and breached its obligations as surety. [#17 at ¶ 5; #1-379 at 5, ¶ 7]. Shortly thereafter, on or about January 16, 2015, Liberty tendered its defense of Double H. Masonry's claims to Milender White, "to protect and save harmless [Liberty] from any loss, cost or expense connected with the above-referenced lawsuit." [#17 at ¶ 6; #1-379 at 5, ¶ 8]. On February 3, 2015, MWCC responded to Double H. Masonry concerning its Payment Bond claim, explaining why Double H. Masonry was not owed what it claimed, and identifying the claims for back charges MWCC had against Double H. Masonry. [#1-379 at 5, ¶ 9; #1-400 at 7, ¶ 9]. One week later, MWCC demanded arbitration of the contractual disputes with Double H. Masonry. [#1-379 at 5, ¶ 10;

#1-400 at 7, ¶ 10]. Ultimately, the arbitration resulted in a mixed award, with Double H. Masonry prevailing as to some claims and MWCC prevailing as to others. The arbitrator found Double H. Masonry to be the prevailing party, as he awarded it a net amount of $518,646.48 in damages and fees. [#1-379 at 6, ¶¶ 14-18; #1-400 at 8, ¶¶ 14-18]; *see* [#1-274 at 12 (ruling that Double H. Masonry was the prevailing party at arbitration because: (1) of the amount of money awarded to it versus the amount of money awarded to Milender White; (2) Double H. Masonry was entitled to a circuit court judgment, offset by the award to Milender White; (3) Double H. Masonry was successful on Milender White's delay claim; and (4) Milender White abandoned any indemnity claim it had intended to assert)]. MWCC satisfied this amount on or about July 5, 2016. [#1-379 at 6, ¶ 19; #1-400 at 8, ¶ 19].

On February 3, 2015, Sherman & Howard L.L.C. ("Sherman & Howard"), sent a letter to Liberty outlining the terms and condition under which it would defend Liberty on behalf of MWCC, but Liberty never signed an engagement letter with Sherman & Howard. [#1-379 at 6, ¶ 20; #1-400 at 8, ¶ 20]. On April 25, 2015, Double H. Masonry amended its Complaint against Liberty to assert the claims for contractual and/or tortious bad faith and for unfair trade practices [#1-379 at 6, ¶ 21; #1-400 at 8, ¶ 21], and Liberty engaged separate counsel. It did not tender the defense of the amended Complaint to MWCC. [#1-379 at 7, ¶ 22; #1-400 at 8-9, ¶ 22]. These claims were not included in nor were they resolved by the arbitration. [#1-379 at 7, ¶ 23; #1-400 at 8-9, ¶ 23].[4] On October 8, 2015, Double H. Masonry again amended its Complaint against Liberty, and dropped the unfair trade practices claim. [#1-379 at 7, ¶ 24; #1-400 at 9, ¶ 24]; *see*

---

[4] Liberty disputes not the accuracy of the statements contained in paragraphs 22 and 23, but that they are material. I find that they are material to the court's analysis set forth below and thus include them in this section.

[#1-87]. Liberty did not tender the defense of the second amended Complaint to MWCC, and continued to rely on separate counsel to defend it. [#1-379 at 7, ¶ 25; #1-400 at 9, ¶ 25]. Double H. Masonry alleged Liberty breached the duty of good faith and fair dealing in a number of respects, including Liberty's alleged conscious "failure to comply with its duties under the [B]ond," failure to provide Double H. Masonry with a copy of its investigative file, failure to independently and reasonably investigate Double H. Masonry's claims, and Liberty's denial of Double H. Masonry's claims without a reasonable basis. [#1-379 at 7, ¶ 26; #1-400 at 9, ¶ 26]. Double H. Masonry further asserted that Liberty failed to give equal consideration to the interests of Double H. Masonry and exhibited "oppression, fraud, or malice." [#1-379 at 7, ¶ 27; #1-400 at 9, ¶ 27].[5] Upon review of Liberty's Motion to Dismiss, the District of South Dakota found as a matter of first impression that suretyship is a type of insurance and thus ruled that Double H. Masonry could proceed as to its claim for tortious bad faith, but could not proceed as to the claim for contractual bad faith, because "South Dakota law does not recognize an extra-contractual remedy for bad faith." [#1-312 at 15]; *see* [#1-379 at 7-8, ¶¶ 28-30; #1-400 at 9, ¶¶ 28-30].

No formal agreement was ever reached between Liberty and Milender White regarding their agreement to defend Liberty in Double H. Masonry's lawsuit against Liberty. [*Id.* at ¶ 7]. Liberty incurred attorney's fees, costs, and expenses in defending itself against Double H. Masonry's lawsuit. [*Id.* at ¶ 8]. On or about December 8, 2016, Double H. Masonry and Liberty

---

[5] Liberty again disputes not the accuracy of the statements contained in paragraphs 25 through 27, but that they are material. I find that they are material to the court's analysis set forth below and thus include them in this section.

mediated their disputes, and Liberty agreed to pay settlement funds to Double H. Masonry to avoid future litigation expense associated with those claims.  [*Id.* at ¶ 9].

At all times, Liberty denied all liability with respect to Double H. Masonry's claims. [#17 at ¶ 10].  Between January 16, 2015 and the date of its Motion for Summary Judgment, Liberty made multiple demands to Milender White and the Indemnitors for reimbursement of Liberty's attorney's fees, costs, expenses, and bond payments related to Double H. Masonry's claims and other losses under Liberty's bonds.  [*Id.* at ¶ 11].  At the time of the Motion for Summary Judgment, Milender White and the Indemnitors had not provided any indemnification funds to Liberty.  [*Id.* at ¶ 12].

## ANALYSIS

### I.  Governing Law

The District of South Dakota transferred the case pursuant to 28 U.S.C. § 1404(a), for the convenience of the Parties.  *See* [#1].  Where a case is transferred from one forum to another under section 1404(a), the transferee court must follow the choice of law rules of the transferor court.  *Van Dusen v. Barrack*, 376 U.S. 612, 635-37 (1964); *Benne v. International Business Machs.*, 87 F.3d 419, 423 (10th Cir. 1996) (observing that "[t]he rule is settled that when a district court grants a venue change pursuant to 28 U.S.C. § 1404, the transferee court is obligated to apply the law of the state in which the transferor court sits.").

Liberty contends that the law of South Dakota should apply.  MWCC argues that Colorado law should apply, and that South Dakota choice of law rules provide that "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it

is made." [#1-380 at 8 (quoting SDCL § 53-1-4)]. MWCC represents that the Indemnity Agreement was executed in Colorado, and acknowledges that the Payment Bond to which the Indemnity Agreement relates was issued in connection with a construction Project in South Dakota. [*Id.* at 9]. Liberty does not address the choice of law issue in its reply/response brief.

South Dakota applies "the most significant relationship approach," as set forth in the Restatement (Second) of Conflict of Laws. *Chambers v. Dakotah Charter, Inc.,* 488 N.W.2d 63, 67 (S.D. 1992). The Restatement (Second) of Conflict of Laws accords the place of performance of the contract paramount importance, "unless, with respect to the particular issue, some other state has a more significant relationship." Restatement (Second) of Conflict of Laws § 196, comment b. Other courts sitting in diversity and considering an indemnity agreement have applied the law of the jurisdiction where performance was contemplated, as advised by this Restatement. *See* Dwight G. Conger, et al., *Construction Accident Litigation* § 6.2 (2d ed. May 2017) (collecting cases from Texas and Michigan). The Payment Bond defines the scope of the Project as "Preconstruction and Construction Services at the Pine Ridge Justice Center Complex, 1001 Horse Thief Parkway, Pine Ridge, South Dakota, 57770." [#1-383]. Given the nature of the Project and the terms of the Payment Bond, which obligated Liberty to extend credit in the event of MWCC's default, I find that the contract was to be performed in South Dakota. Presumably, claims made under the Payment Bond were occasioned by work performed, or not performed, at the location of the Project. And MWCC does not address why Colorado has a more significant relationship to the contract, other than to reference its brief filed in support of the motion to transfer. [#1-380 at 9]. Thus I find that the law of South Dakota should apply. I

note that MWCC asserts, "[r]egardless of which state's laws govern the interpretation of the [Indemnity Agreement]…, the outcome is the same." [*Id.*]

## II.    The Cross Motions for Summary Judgment

Liberty moves for summary judgment on its first claim for "Breach of Express Contract against All Indemnitors."  MWCC cross moves for summary judgment in its favor on the first claim, and moves for summary judgment on the second claim for common law indemnity.  In essence, Liberty argues that the money expended in its defense against Double H. Masonry's claims constitutes losses sustained as a result of executing the Payment Bond and, as such, MWCC is liable for those losses as expressly conditioned by the Indemnity Agreement.  MWCC argues it cannot be liable for Liberty's losses because MWCC ultimately "fully paid and satisfied all of the liability to Double H under the bonded subcontract"; and the "vast majority" of the losses Liberty claims were incurred to defend and settle bad faith claims asserted by Double H. Masonry against Liberty, which falls outside of the Indemnity Agreement. *See* [#1-379].

As explained by Liberty, it was required under the Payment Bond to perform Milender White's obligations if Milender White failed to so perform and, in exchange, MWCC/the Indemnitors agreed to reimburse Liberty for any losses or expenses Liberty incurred.  [#17 at 2]. Specifically, the Indemnitors agreed to:

> [E]xonerate, hold harmless, indemnify, and keep indemnified the Surety from and against any and all liability for losses, fees, costs, and expenses of whatsoever kind or nature including, but not limited to, pre- and post-judgment interest at the maximum rate permitted by law accruing from the date of a breach of this Agreement or a breach of any other written agreements between or for the benefit of the Surety and the Indemnitor(s) and/or Principal(s) (hereinafter referred to as "Other Agreements"), court costs, counsel fees, accounting, engineering and any other outside consulting fees and from and against any and all such losses, fees, costs and expenses which the Surety may sustain or incur: (1) by reason of being requested to execute or procure the execution of any Bond; or (2) by having

executed or procured the execution of any Bond; or (3) by reason of the failure of the Indemnitors or Principals to perform or comply with any of the covenants and conditions of this Agreement or Other Agreements; or (4) in enforcing any of the covenants and conditions of this Agreement or Other Agreements.

[#1-384 at 1].

The court must first resolve whether the bad faith claim settled in the South Dakota Action is subject to the Indemnity Agreement; then, the court must consider whether Liberty incurred additional losses that are subject to the Indemnity Agreement. Finally, the court addresses MWCC's argument that Liberty is precluded from pursuing a claim for common law indemnification. In addressing these questions, the court examines how South Dakota law treats suretyship.

**A.    Losses Associated with the Bad Faith Claim**

      1.    <u>Contractual Language and Allegations</u>

The court begins by considering the nature of the relationship between Liberty and Double H. Masonry. Although neither Party includes the relevant contractual language in their respective statements of undisputed facts, there can be no doubt that the Payment Bond imposed the following obligations on Liberty with respect to a claimant, which in this situation describes the status of Double H. Masonry. Upon receipt of a written claim under the bond, Liberty "shall promptly and at [its] expense take the following actions":

[s]end an answer to the Claimant, with a copy to the Owner, within sixty (60) days after receipt of the Claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed; and [p]ay or arrange for payment of any undisputed amounts.

[#1-383 at 2, §§ 7 through 7.2].

Double H. Masonry alleged in its pleadings in the South Dakota Action that on November 26, 2014, after conflicts arose between it, Milender White, and the Tribe regarding Double H. Masonry's entitlement to payments for work performed and material provided on the Project, Double H. Masonry provided Liberty, Milender White, and the Tribe with notice of its claim on the Payment Bond. [#1-1 at ¶ 183; #1-47 at ¶ 231]. Pursuant to section 7.1 of the Payment Bond, Liberty had sixty days in which to respond to Double H. Masonry's notice of claim. On January 9, 2015, forty-four days after it provided notice of its claim, Double H. Masonry sued Liberty for breach of the Payment Bond, asking for $848,755.61 to reimburse it for work performed on and materials supplied to the Project. *See* [#1-1].

On May 26, 2015, Double H. Masonry amended its pleading to add a claim for Contractual and/or Tortious Bad Faith against Liberty. *See* [#1-47]. In support of the claim, Double H. Masonry alleged in relevant part as follows: (1) Liberty did not send an answer to it within sixty days after Liberty received Double H. Masonry's written statement of its claim, stating the amounts that were undisputed and the basis for challenging any amounts that were disputed; (2) no employee of Liberty ever responded to Double H. Masonry's written statement of claim indicating the amounts that were undisputed and the basis for challenging any amounts that were disputed; (3) Liberty consciously failed to comply with duties under the bond; (4) Double H. Masonry repeatedly requested Liberty's investigative file and Liberty failed to supply the file; and (5) Liberty did not independently and reasonably investigate Double H. Masonry's claims. [#1-47 at 32].

## 2.    Governing Case Law

***Bad Faith.***    To frame the context of the dispute regarding the bad faith claim, the undersigned begins by reviewing how courts across jurisdictions interpret the surety relationship. A survey of orders and opinions demonstrates that jurisdictions are divided with respect to whether claims for bad faith may be asserted against a surety. *Compare, e.g., Cates Construction, Inc. v. Talbot Partners*, 21 Cal. 4th 28, 980 P.2d 407 (1999) (holding *inter alia* that tort remedies were not available for the surety's breach occurring in the context of construction performance bond or any other "contract of suretyship" because the suretyship relationship is fundamentally difference than the insurance relationship) *with Colorado Structures, Inc. v. Insurance Co. of the West*, 161 Wash. 2d 577, 167 P.3d 1125 (2007) (opining in a 5-4 en banc decision that *Cates* represents a "minority position," and ruling that "all surety bonds are regarded as in the nature of insurance contracts, and controlled by the rules of interpretation of such contracts" and thus "there seems little basis for us to create an exception for performance bond"); *Transamerica Premier Ins. Co. v. Brighton School Dist. 27J*, 940 P.2d 348, 353-54 (Colo. 1997) (holding as a matter of first impression that, "[w]hile there may be differences in the form of the suretyship agreement and the obligations of the parties, its substance is essentially the same as insurance," and that "Colorado common law recognizes a cause of action in tort for a commercial surety's failure to act in good faith when processing claims made by an obligee pursuant to the terms of a performance bond.").

In the South Dakota Action, the court addressed the question as a matter of first impression in ruling that Double H. Masonry could, and did, state a bad faith claim against Liberty. *Double H Masonry, Inc. v. Liberty Mutual Ins. Co.*, CIV 15–5004, 2016 WL 5816997,

at *9 (D.S.D. Sept. 30, 2016). The court began by noting that South Dakota law recognizes a bad faith cause of action in the insurance context. *Id.* at *3 (citing *Stene v State Farm Mutual Auto Ins Co*, 583 N.W.2d 399, 403 (S.D. 1998)). It recognized that "[l]itigation of bad faith claims can be presented in either a first or third-party bad faith context," and stated it would address only first party bad faith for the purposes of Liberty's motion. *Id.* at *3, n.8. The court then defined a first party bad faith claim as "an intentional tort [that] occurs when an insurance company engages in wrongdoing during the process of paying a claim to its insured," specifying that to prove such a claim, the insured must show "an absence of a reasonable basis for denial of policy benefits *and* the knowledge or reckless disregard of a reasonable basis for denial." *Id.* (quoting *Matter of Certification of a Question of Law*, 399 N.W.2d 320, 324 (S.D. 1987); citing *Hein v Acuity*, 731 N.W.2d 231, 235 (S.D. 2007)).[6] As the basis for its analysis, the court compared decisions issued in jurisdictions not recognizing a bad faith claim in a surety context to those in jurisdictions that do recognize such a claim, and found that the analysis supplied by the jurisdictions that allow the claim was more persuasive; it reviewed the South Dakota Insurance Code, which it observed includes reference to sureties; and it referenced a 1979 South Dakota Supreme Court decision that concluded the state's legislature had defined a surety as an insurer. *Id.* at *7-10.

The South Dakota court then discussed policy considerations, and cited with approval an opinion of the Delaware Superior Court finding that, "[t]o allow the surety to purposefully delay or intentionally manipulate payment to their benefit would undermine the primary purpose of

---

[6] South Dakota describes third party bad faith as arising "when an insurer wrongfully refuses to settle a case brought against its insured by a third-party," and specifies that third party bad faith "exists when an insurer breaches its duty to give equal consideration to the interests of its insured when making a decision to settle a case." *Hein v Acuity*, 731 N.W. 2d 231, 235 (S.D. 2007).

insulating the obligee from the risk of default." *Id.* at *10 (quoting *Int'l Fid Ins Co v Delmarva Sys Corp*, 2001 WL 541469, at *9 (Del. Super. Ct. May 9, 2001)). The court expressly found as its belief, "that [] imposing tort damages on a surety who refuses to reasonably investigate and pay a valid claim would function as a deterrent"; and that "the availability of a bad faith claim against a surety will act as a type of 'check' that is a reasonable means to deter bad faith handling of legitimate claims." *Id.* (citing *Dodge v Fid & Deposit Co of Md*, 778 P 2d 1240 (Ariz 1989)).

In finding that a tort claim for bad faith could exist between Double H. Masonry and Liberty, the District of South Dakota necessarily recognized that the relationship between those two parties involved a special element of reliance or duty similar to the insurance relationship. *Double H Masonry, Inc.*, 2016 WL 5816997, at *11 (concluding that the differences between a surety relationship and an insurer/insured relationship do not warrant "total denial of a tort remedy against a surety for breach of a bond," finding that "there is a special relationship between a surety and obligee, similar to that of an insurer and its insured in that an obligee too relies on a surety to guarantee performance and/or payment in the event of a default"). The South Dakota court did not resolve the question of whether Liberty had in fact acted in bad faith because the parties settled their dispute prior to a ruling on dispositive motions; the court determined only that the type of relationship necessary to give rise to such a claim existed.[7] That court's ruling is not only a reasoned prediction of what the Supreme Court of South Dakota

---

[7] I note the affidavit of Jeremy Medeiros, Home Office Counsel for Liberty, filed in support of Liberty's Motion for Partial Summary Judgment, in which Mr. Medeiros attests that on December 5, 2014, he wrote to Double H. Masonry to confirm receipt of the notice of claim and to request that Double H. Masonry "provide additional documents to Liberty to allow Liberty to complete its investigation." [#1-377 at ¶¶ 9-10].

would do, *see id.* at *2 ("[w]hen there is no state supreme court case directly on point, our role is to predict how the state supreme court would rule if faced with the [same issue]") (citation omitted), it is law of the case.[8]  Therefore, the rulings contained herein must comport with those rendered in the South Dakota Action.

 *Contract.*  In South Dakota, surety agreements are enforced according to their terms, and courts endeavor to construct the contract in a way that will "most nearly carry out the intention of the parties."  *Moriarty v. Tomlinson*, 235 N.W. 363 (S.D. 1931).  To determine intent, the court looks to the language used, and enforces the contract as written when the "meaning of contractual language is plan and unambiguous."  *Ziegler Furniture & Funeral Home, Inc. v. Cicmanec*, 709 N.W.2d 350, 354 (S.D. 2005).  Whether a contractual indemnity provision is ambiguous is generally considered to be a question of law.  *Id.*  "A contract is ambiguous when application of rules of interpretation leave a genuine uncertainty as to which of two or more meanings is correct."  *Id.* (citation omitted).

 "As a general proposition, assuming a valid contractual indemnity provision, most courts are in agreement that the indemnitee may have indemnification for the consequences of his own negligence."  Conger, *supra*, § 6.2.  However, "an indemnitee will not be permitted

---

[8] The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Roth v. Green*, 466 F.3d 1179, 1187 (10th Cir. 2006) (quoting *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (further citation omitted)). "As it is most frequently applied, law of the case encompasses a lower court's adherence to its own prior rulings, to the rulings of its superior court in the case, or to the rulings of another judge or court in the same case or a closely related case." *Aguinaga v. United Food & Commercial Workers Int'l Union,* 854 F. Supp. 757, 773 (D. Kan. 1994). *See United States v. Bates*, 614 F.3d 490, 494 (8th Cir. 2010) ("The law-of-the-case doctrine prevents 'the relitigation of settled issues in a case, thus protecting the settled expectations of parties, ensuring uniformity of decisions, and promoting judicial efficiency.'" (quoting *First Union Nat'l Bank v. Pictet Overseas Trust Corp., Ltd.,* 477 F.3d 616, 620 (8th Cir. 2007)).

indemnification for his own negligence under a contract unless the agreement provides for this result in clear and unambiguous terms." *Id.* (collecting cases). *See Bartak v. Bell-Galyardt & Wells, Inc.*, 473 F. Supp. 737, 739 (D.S.D. 1979) ("Specific language must be used in an indemnity contract if one is to be held liable for losses attributable to another's negligent acts…it is frequently stated as a general rule that a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting from his own negligent acts unless such intention is expressed in clear and unequivocal terms, or unless no other meaning can be ascribed to it") *judgment rev'd on other grounds by Bartak v. Bell-Galyardt & Wells, Inc.*, (8th Cir. 1980); *Bell v. East River Electric Power Cooperative, Inc.*, 535 N.W.2d 750, 753 (S.D. 1995). *See also Williams v. White Mountain Const. Co., Inc.*, 749 P.2d 423, 426 (Colo. 1988) ("[B]road, all-inclusive[]…language…is itself one of the indicia which the law regards as insufficient. The purpose to impose this extraordinary liability on the Indemnitor must be spelled out in unmistakable terms. It cannot come from reading into the general words used the fullest meaning which lexicography would permit") (quoting *Batson–Cook Co. v. Industrial Steel Erectors,* 257 F.2d 410, 412 (5th Cir. 1958) (denying general contractor indemnity against its subcontractor for claims brought by an injured worker because the indemnity provision "[did] not contain these talismanic words: 'even though caused, occasioned or contributed to by the negligence, sole or concurrent' of the indemnitee, or like expressions.")); 3 Phillip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor On Construction Law* § 10:12 (August 2017) ("The only interpretive rule with universal application to express indemnity agreements is that the broader the scope of the purported indemnity obligation and the less specific the language utilized, the more difficult the enforcement.").

3.    Application

The Indemnity Agreement provides that the Indemnitors were required to indemnify Liberty for losses, fees, costs, and expenses that Liberty may sustain or incur in the following four scenarios:

> (1) by reason of being requested to execute or procure the execution of any Bond; or (2) by having executed or procured the execution of any Bond; or (3) by reason of the failure of the Indemnitors or Principals to perform or comply with any of the covenants and conditions of this Agreement or Other Agreements; or (4) in enforcing any of the covenants and conditions of this Agreement or Other Agreements.

[#1-384 at 1].  Liberty asserts that the language of the Indemnity Agreement is extremely broad, and certainly broad enough to contemplate the indemnity Liberty seeks.  However, I find that the breadth of the pertinent provision cuts against Liberty.

The survey of cases compiled in Bruner & O'Connor, *supra*, § 10:12 makes clear that courts across jurisdictions impose varying tests for interpreting indemnity clauses.  Bruner & O'Connor categorizes the various approaches as strict construction, "stricter than strict," and "'liberal' or 'fair'" construction.  Bruner & O'Connor, *supra*, §§ 10:12, 10:13, 10:16.  "The most common articulation of the strict construction test is the search for 'clear and unequivocal' language."  *Id.* at § 10:12 (citing law from Hawaii, Kentucky, and Montana).  Courts employing this approach often express their findings in the negative, e.g., "general, broad, and all-inclusive language that … is not sufficient" to permit indemnity.  *Id.* (citing law from Missouri and Maine).  And one Arkansas court refused to permit an indemnitee indemnification for its own negligent acts "unless the purpose to do so is spelled out in unmistakable terms."  *Id.* (quoting *Arkansas Kraft Corp. v. Boyed Sanders Const. Co.*, 298 Ark. 36 (1989)).  The American Law Institute has opined as follows:

On the issue of the specificity of language required to effectively provide for indemnity for the indemnitee's own negligence, the rule stated in this section follows the nearly universal rule that the parties must state such an intention in clear and unequivocal terms. The rule does not, however, require incantation of specific words. It is often difficult in a contract to specify all of the specific causes of action that might give rise to liability. As long as the parties are clear, their failure to use a specific word should not defeat their objective intent. Of course, the presence or absence of specific words will often help the court interpret the contract.

*Id.* (citing Restatement (Third), Apportionment of Liability § 31, cmt. f (proposed final draft)).[9]

This court is without the benefit of a dispositive ruling on the topic issued by the Supreme Court of South Dakota or any of its lower courts. But an analysis of the authority from other jurisdictions leads the court to conclude that it need not fashion a precise test for South Dakota. Rather, regardless of the ultimate test, the weight of authority requires more precise language than what is contained in the Indemnity Agreement to evidence that the Parties

---

[9] Some courts, such as those in Texas, apply a stricter standard. The Texas Supreme Court determined in 1987 that the better policy for discerning the Parties' intentions is to "cut through the ambiguity of those provisions and adopt the express negligence doctrine," which requires the indemnity clause to state specifically that the parties' intention is to indemnify the indemnitee for its own negligence. *Ethyl Corp. v. Daniel Const. Co.*, 725 S.W.2d 705, 707-08 (Tex. 1987). *Accord Hamblin v. Lamont*, 433 S.W.3d 51 (Tex. App. 2013). *See also Category 5 Management Group, LLC v. National Casualty Co.*, 480 F. App'x 536, 539 (11th Cir. 2012) (applying Louisiana law to hold that defendant owed no duty of indemnity where contract did not "unequivocally state that [defendant] will indemnify [plaintiff] for [plaintiff's] own negligent acts"); *Dykstra v. Arthur G. McKee & Co.*, 100 Wis. 2d 120 (1981) ("specific and express statement in the agreement"); *Moore Heating & Plumbing, Inc. v. Huber, Hunt & Nichols*, 583 N.E.2d 142 (Ind. Ct. App. 1991) ("the indemnity for the indemnitee's own negligence must be specifically, not generally, prescribed"); *Westinghouse Elec. Corp. v. Williams*, 183 Ga. App. 845 (1987) ("in the absence of explicit language" indemnity will not be found).

Finally, some courts "faced with deciding whether to require one contracting party to indemnify the other for the other's own negligence simply inquired whether the contract language, fairly construed, evidenced such an intent." Bruner & O'Connor, *supra*, § 10:16. Upon finding that the contracting parties so intended, these courts require indemnification, "even to the extent that the indemnitee [is] 100% at fault." *Id.* (citing case law from Arizona, Minnesota, and Washington). While this model of interpretation enjoyed early popularity, many jurisdictions moved to a "strict construction" approach in the early 1970s, which coincided with tort reform efforts and anti-indemnification statutes. *Id.* (using Minnesota as an example).

contracted, or intended to contract, that MWCC would indemnify Liberty for Liberty's alleged bad faith with respect to a bond claimant.  *See Bartak*, 473 F. Supp. at 739; *Bell*, 535 N.W.2d at 753.  *See also* Conger, *supra*, § 6.3 ("What now appears to be the majority view is that 'express negligence' language, or magic words, is no longer required so long as the intent of the parties is clear from an analysis which looks not only to the language of the indemnity agreement, but other pertinent provisions of the contract documents, the situation of the parties and 'surrounding circumstances.'").

Thus, I find first that it is not clear and unambiguous under the Indemnity Agreement that MWCC agreed to indemnify Liberty for Liberty's bad faith.  *Cf. Williams v. White Mountain Const. Co., Inc.*, 749 P.2d at 426 (resolving ambiguities against a finding of indemnity and stating, "[w]e are mindful that it is inappropriate to construe statements so narrowly as to deprive them of any meaning, yet the burden of indemnity is so onerous that we hesitate to impose it unless the language used clearly requires such a result").  I find second, in light of the District of South Dakota court's findings and explanation of policy reasons underlying those findings, that the bad faith claim asserted by Double H. Masonry against Liberty is not a risk insured by the Indemnity Agreement such that MWCC is required to indemnify Liberty for losses associated with defending it.  *See Ziegler Furniture & Funeral Home, Inc.*, 709 N.W.2d at 355 ("a contract is ambiguous only when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement") (citation omitted).  *See also* Conger, *supra*, § 6.2 ("[r]esolution of an ambiguity does not become

a jury question unless the ambiguity remains after application of appropriate rules of construction") (citing Georgia law).[10]

This conclusion is consistent with the policy rationale behind bad faith claims, and the holding in the South Dakota Action. South Dakota law recognizes bad faith claims in part to punish insurance companies that fail to fairly and adequately investigate insurance claims, with the aim of deterring such conduct. *See Walz v. Fireman's Fund Ins. Co.*, 556 N.W.2d 68, 70 (S.D. 1996) (reviewing bad faith claim in context of denial of workers' compensation benefits).

---

[10] The court notes that at least one other court arrived at a different outcome when presented with a similar dispute. *See Premier Elec. Const. Co. v. American Nat. Bank and Trust Co. of Chicago*, 236 Ill. App. 3d 333, 177 Ill. Dec. 663, 603 N.E.2d 733 (1st Dist. 1992). In *Premier Elec.*, for five years the principal defended on the surety's behalf a lawsuit brought by a subcontractor pursuant to a payment bond. Ultimately, the court entered a partial summary judgment in favor of the subcontractor. After which, the subcontractor moved and received leave to amend its complaint to assert a claim under Illinois statutory law against the surety, alleging the surety in bad faith failed to investigate the bond claim. The principal refused to indemnify the surety for the bad faith claim, stating its belief that the claim did not arise under the bond. The surety then counterclaimed against the principal for indemnification for liability, fees, and costs arising from the bad faith claim. The trial court granted the surety's motion for summary judgment on the bad faith claim, and then ruled as to the counterclaim that the principal was obligated to indemnify the surety for expenses incurred in defending the bad faith claim, stating "that the language in the Indemnity Agreement was ambiguous, but logic alone indicated that [the principal] should pay attorney fees and court costs." *Id.* at 335. The Illinois Court of Appeals affirmed. It is clear to this court in reading the opinion that the logic the trial court relied upon was the fact that the principal "was involved in the delay" alleged in the bad faith claim: "Since [the principal] was in charge of [the surety's] defense on [the payment bond claim], [the principal] was involved in the long delay of the payment on the claim. Therefore, we reject [the principal's] argument that it is not required to indemnify [the surety] for its attorney fees and costs in defending against [the bad faith claim]. *Id.* at 336. This court is presented with a slightly different set of circumstances; namely, it is not clear on the face of this action that MWCC is responsible for the delay that gave rise to Double H. Masonry's bad faith claim. Indeed, Double H. Masonry amended its complaint to add that claim mere months after it initiated the South Dakota Action, *see* [#1-47], and while it was engaged in arbitration with MWCC, *see* [#1-16]. Thus, this court is persuaded for the reasons stated above that the Indemnity Agreement does not provide for MWCC to indemnify Liberty for Liberty's alleged tortious bad faith conduct as a matter of law.

The South Dakota court noted as much when it opined that "imposing tort damages on a surety who refuses to reasonably investigate and pay a valid claim would function as a deterrent." *Double H Masonry, Inc.*, 2016 WL 5816997, at *10. The cause of action is framed to deter the surety, not the principal, and Double H. Masonry's pleading demonstrates that, for the purpose of the bad faith claim, it is the surety that allegedly acted inconsistent with its obligations. The surety could neutralize the deterrent, and thereby circumvent its purpose, if it were allowed simply to pass off the cost to the principal through a broad, but imprecise, indemnification provision.

Accordingly, I find that Liberty's alleged bad faith with respect to Double H. Masonry arises pursuant to a relationship between Liberty and Double H. Masonry that is separate and apart from the contractual relationship between Liberty and MWCC, and the Parties did not expressly provide that MWCC would indemnify Liberty for liability associated with tortious bad faith. For this reason, I **DENY IN PART** Liberty's Motion for Summary Judgment on its first claim, and I **GRANT IN PART** MWCC's Cross Motion for Summary Judgment. Liberty's Motion is denied to the extent it seeks judgment in its favor that MWCC breached the Indemnity Agreement by failing to indemnify Liberty for costs associated with the defense of the bad faith claim, and MWCC's Motion is granted to the extent it seeks judgment in its favor that it was not required as a matter of law to indemnify Liberty for costs associated with the defense of the bad faith claim. The court now addresses the issue of losses Liberty asserts were not incurred by the defense of the bad faith claim

**B.      Losses Associated with Construction Claims**

In a footnote on page 19 of its brief in response to Liberty' Motion for Summary Judgment/brief in support of its Cross Motion for Summary Judgment, MWCC "acknowledges a small fraction of Liberty's claimed losses may be subject to indemnity under the [Indemnity Agreement] because they relate to the Bond claim, rather than Liberty's bad faith conduct." [#1-380 at 19, n.2]. MWCC posits that these losses occurred in connection to Liberty retaining its own counsel at the time Double H. Masonry amended its pleading to add the claim for bad faith, and asserts that, at a minimum, any recoverable losses "must have occurred before November 4, 2015, when [the South Dakota Action] was stayed pending arbitration," because all claims but the one alleging bad faith were resolved as a result of the arbitration. *Id.* MWCC suggests that an evidentiary hearing "may be necessary to determine the amount of Liberty's losses unrelated to bad faith." *Id.* Liberty responds in its own footnote that "[a]t a minimum, there is a question of fact regarding which of Liberty's losses were incurred defending construction claims and which are related to bad faith claims." [#1-400 at 3, n.2].

Liberty's losses associated with Double H. Masonry's Breach of Payment Bond claim implicate the Payment Bond and the Indemnity Agreement, and thus I again consider the language of the Parties' Indemnity Agreement. The Indemnitors were required to indemnify Liberty for losses, fees, costs and expenses that Liberty may sustain or incur in the following four scenarios:

> (1) by reason of being requested to execute or procure the execution of any Bond; or (2) by having executed or procured the execution of any Bond; or (3) by reason of the failure of the Indemnitors or Principals to perform or comply with any of the covenants and conditions of this Agreement or Other Agreements; or (4) in enforcing any of the covenants and conditions of this Agreement or Other Agreements.

[#1-384 at 1].

In support of its claim for Breach of Payment Bond, Double H. Masonry alleged in relevant part that Milender White and the Tribe "breached their respective contracts by failing to pay Double H. Masonry for all the work performed and materials provided on the [P]roject." [#1-61 at ¶ 199]. Liberty asserts that it received a claim, incurred a loss, and did not obtain reimbursement from MWCC. [#17 at 10]. For support, Liberty attaches the affidavit of Mr. Medeiros, which delineates Liberty's losses as follows: $122,500 in bond payments; $192,043 in attorney's fees; and $5,654 in costs and expenses, with ongoing losses. *See* [#1-377 at ¶ 19]. It is an undisputed fact that MWCC has paid its contractual obligations as determined by the arbitration. [#1-379 at 6, ¶ 19]. Nonetheless, Liberty asserts that the Indemnitors have failed to reimburse it entirely for losses associated with its having executed the Payment Bond, with the failure of Milender White and/or the Indemnitors to perform or comply with their obligations under the Payment Bond and/or associated agreements, and with its actions to enforce the covenants and conditions of the Payment Bond and/or associated agreements.

In South Dakota, as in many jurisdictions, the essential elements of a breach of contract claim are: 1) an enforceable promise; 2) a breach of the promise; and 3) resulting damages. *See, e.g., Guthmiller v. Deloitte & Touche, LLP,* 699 N.W.2d 493, 498 (S.D. 2005) (citation omitted). *See also Western Distribution Co. v. Diodosio,* 841 P.2d 1053, 1058 (Colo. 1992). "When the meaning of contractual language is plain and unambiguous, construction is not necessary"; only "[i]f a contract is found to be ambiguous [do] the rules of construction apply." *Ziegler Furniture & Funeral Home, Inc.,* 709 N.W.2d at 354 (citation omitted). The Indemnity Agreement stated that "evidence of any such payments made by the Surety shall be prima facie evidence of the fact

and amount of the liability to the Surety," [#1-384 at 1]. There is no dispute that Liberty made payments under the Payment Bond, tendered defense of Double H. Masonry's initial complaint on January 16, 2015 [#1-379 at 5, ¶ 8], and incurred expenses in defending itself against the Breach of Payment Bond Claim.

Accordingly, I find that MWCC is liable under the Indemnity Agreement to indemnify Liberty for losses Liberty incurred in defending Double H. Masonry's first claim for Breach of Payment Bond. Indeed, MWCC appears to concede liability on this point. However, the question of damages, i.e., the amount of loss Liberty incurred, is a dispute of fact that cannot be settled at the summary judgment stage, in large part because the Parties did not fully brief the issue or cite to the necessary, supporting evidence. Therefore, Liberty's Motion for Summary Judgment is **GRANTED IN PART**, as to liability on the question of indemnification regarding Double H. Masonry's claim for Breach of Payment Bond, and MWCC's Cross Motion for Summary Judgment is **DENIED IN PART**, as to this issue. To the extent the Parties cannot stipulate as to the amount of loss Liberty incurred, the issue may be subject to a forthcoming dispositive motion, if appropriate, or included in the trial to the court.

### C.     Common Law Indemnification

The court turns next to the portion of MWCC's Motion that seeks judgment in its favor on Liberty's second claim for Common Law Indemnification, on the basis that such claim is subsumed by a contractual basis for indemnification. [#1-380 at 9, 10]. MWCC argues that its liability to indemnify Liberty "turns on the language of the [Indemnity Agreement]," and not common law indemnity principles. Thus, because the Parties have a written agreement, Liberty's right to indemnification from MWCC arises from the Indemnity Agreement, or not at

all.  Liberty argues that it, as a surety, has common law rights that it can access and pursue concurrently with its contractual rights, and that under South Dakota law, a claim not sounding in contract is precluded only when it asserts the same rights as those steeped in a contract.  [#1-400 at 11].  For the reasons stated below, the court agrees that Liberty has a common law right to indemnity regardless of its written agreement with MWCC.[11]

The surety's right to indemnity is well established at common law.  *See, e.g., Liberty Mut. Ins. Co. v. Aventura Eng'g & Constr. Corp.*, 534 F. Supp. 2d 1290, 1303 (S.D. Fla. 2008), 4 Phillip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor On Construction Law* § 12:97 (August 2017) ("By the 15th century, the surety's four fundamental equitable rights were well-recognized: exoneration, indemnity, subrogation, and contribution") (citation omitted).[12]  A surety may maintain an action for pure common law indemnity where there is no contract between it and the indemnitor, Conger, *supra*, § 9.2; although the recognized modern practice is for sureties "to condition their issuance of bonds upon the execution by the contractor and other designated indemnitors of written agreements of indemnity."  Philip L. Bruner & Tracey L. Haley, *Managing and Litigating the Complex Surety Case*, 121 (2d Ed. 2007).  However, the law does not suggest that a surety loses its common law rights the moment it enters into an indemnity agreement, and rather, the court must consider the terms of that indemnity agreement in determining what common law rights the surety may assert.  *See Aventura Eng'g & Constr. Corp.*, 534 F. Supp. 2d at 1303 (observing the indemnity agreement as a written document serves

---

[11] The court references in this section secondary sources and case law from other jurisdictions for the purpose of providing a thorough description of the state of common law indemnity.

[12] The right to indemnity is also recognized by statute in South Dakota.  *See* S.D. Codified Laws §§ 56-2-13, 56-2-14.

to "memorialize, enhance and supplement [the surety's] common law rights") (citing Bruner & Haley, *Managing and Litigating the Complex Surety Case*, 121). A survey of the relevant law demonstrates that reliance on contractual indemnity does not preclude the surety from also relying on common law indemnity. *Chi. G. W. R. Co. v. Farmers Produce Co.*, 164 F. Supp. 532, 537 (N.D. Iowa 1958). *See Hawkins Const. Co. v. First Federal Savings and Loan Ass'n*, 416 F. Supp. 388, 395 (S.D. Iowa 1976) ("First Federal is relying upon contractual indemnity and common law or implied indemnity…[r]eliance on one theory does not foreclose reliance on the other"); Conger, *supra*, § 9:2 ("Whether or not the [common law] remedy exists is not dependent upon any statute or contractual relationship between the parties") (citing *Fireside Motors, Inc. v. Nissan Motor Corp. in U.S.A.*, 395 Mass. 366, 370 (1985); *Dale v. Whiteman*, 388 Mich. 698, 705-06 (1972)); Bruner, *supra*, § 10:4 ("In the absence of, or sometimes in addition to, an express indemnity provision, one party may under the common law, seek indemnification from another"). *But see Charlotte Motor Speedway, Inc. v. Tindall Corp.*, 195 N.C. App. 296, 672 S.E.2d 691 (2009) (holding there "can be no implied contract where there is an express contract between the parties in reference to the same subject matter," in case where the parties executed an express indemnification provision that, by its terms, did not cover the losses for which plaintiff sought indemnification).

MWCC cites Bruner & O'Connor Construction Law for the proposition that "[w]here a written agreement exists, the surety's indemnity rights will be determined by the contract rather than by common-law indemnity principles." [#1-380 at 10 (citing Bruner, *supra*, § 10:103)]. However, a review of the cases the treatise cites in support confirms that this statement lives within the context of *Charlotte Motor Speedway, Inc.*, i.e., where express terms govern the

question of indemnification, indemnity is available, or not, under those terms.[13]  The same is true

for the additional case law MWCC cites.  *See* [#1-380 at 10].[14]  As discussed above, the court

finds that the Indemnity Agreement requires more precise language than what it contains to

evidence that the Parties' contracted, or intended to contract, that MWCC would indemnify

Liberty for Liberty's alleged bad faith with respect to a bond claimant.  MWCC has cited the

court to no case law indicating that a surety cannot rely on common law indemnity where the

court finds that an indemnity agreement does not address the nature of the indemnity sought, and

I find that the law suggests common law indemnity may serve to protect the interest of the surety

where the Parties' contractual agreement is silent as to the question.  Indeed, this is a result

congruent with the long history of equitable remedies available to sureties.  Thus, the court

construes this claim as Liberty asserting a right to indemnity in the absence of a written

---

[13]  In *Fidelity and Deposit Co. of Maryland v. Bristol Steel & Iron Works, Inc*., 722 F.2d 1160, 1163 (4th Cir. 1983), the court held that the sureties were entitled "[u]nder the 'letter' of this contract," to reimbursement by the contractor for payments made under the performance bond by the sureties in good faith.

[14]  For instance, the court in *Gulf Insurance Co. v. AMSCO, Inc.*, 889 A.2d 1040, 1046 (N.H. 2005), examined the indemnity agreement to ascertain the intention of the contracting parties and found no ambiguity as to the terms of the indemnity.  The court in *Rich Products Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 981-82 (E.D. Wis. 1999), cited with approval Illinois law holding that "[r]ecovery under a contract providing for indemnity obviates any right to recovery under the common law theory of implied indemnity since by such an express contract the parties have already themselves determined how and under what circumstances losses shall be allocated."  The court finds that the Parties here did not determine how and under what circumstances they should allocate losses associated with Liberty's alleged bad faith conduct. Finally, in *Union Pacific Railway Co. v. Bridal Veil Lumber Co*., 219 F.2d 825, 832 (9th Cir. 1955), cert. denied, 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 849 (1956), the Ninth Circuit held, in considering Oregon law, "that the rights of indemnity, if any, must be found in the contract which supersedes the common law of Oregon (insofar as the contract contravenes it) by specifically dealing with the subject."  Again, I find that the Indemnity Agreement does not specifically deal with the subject presently in dispute.

agreement.  As explained below, a surety seeking such relief is limited only by whether the surety shares in any of the wrongdoing.

"The law of indemnity is well settled in [South Dakota law]: indemnification arises when a party discharges a liability that equitably should have been discharged by another." *CenturyLink Communications, LLC v. B&B Foundation Service, Inc.*, CIV. 15–5074–JLV, 2017 WL 3738528, at *3 (D.S.D. Aug. 30, 2017) (citing *Weiszhaar Farms, Inc. v. Tobin*, 522 N.W.2d 484, 492 (S.D. 1994); *Jorgensen Farms, Inc. v. Country Pride Corp.*, 824 N.W.2d 410, 414 n.2 (S.D. 2012)).  The Eighth Circuit has described South Dakota common law as follows: "[the law] does not preclude indemnity between joint tortfeasors but 'the situations in which indemnity is allowed are exceptional and limited.'"  *Henningson, Durham & Richardson, Inc. v. Swift Bros. Const. Co.*, 739 F.2d 1341, 1345-46 (8th Cir. 1984) (quoting *Ebert v. Fort Pierre Moose Lodge # 1813,* 312 N.W.2d 119, 123 (S.D. 1981)).  In affirming that an architecture firm was not entitled to indemnity from a general contractor due to the firm's own negligence, the Eighth Circuit relied on South Dakota law in explaining, "[i]f a person seeking indemnity personally participates in an affirmative act of negligence, or is physically connected with an act of omission by knowledge or acquiescence in it on his part, or fails to perform some duty in connection with the omission which he has undertaken, he is deprived of the right of indemnity."  *Id.* at 1346 (quoting *Degen v. Bayman,* 86 S.D. 598, 200 N.W.2d 134, 137 (1972)). Specifically, "before a joint tortfeasor can shift one hundred percent of the recovery upon another joint tortfeasor, he must show a proportionate absence of contributory negligence on his part."  *Id.* ("where each is chargeable with active or affirmative negligence contributing to the injury, neither is entitled to indemnity from the other.").  *See Massey Ferguson Credit Corp. v.*

*Bice*, 450 N.W.2d 435 (S.D. 1990) ("If a person seeking indemnity personally participates in an affirmative act of negligence, or is physically connected with an act of omission by knowledge or acquiescence in it on his part, or fails to perform some duty in connection with the omission which he has undertaken, he is deprived of the right of indemnity.") (quoting *Degen*, 86 S.D. at 604).

This principle is supported by the Restatement (Second) of Torts § 886B, which provides that where no written agreement exists, indemnity may lie as follows: "[i]f two persons are liable in tort to a third person for the same harm and one of them discharges the liability of both, he is entitled to indemnity from the other if the other would be unjustly enriched at his expense by the discharge of the liability." The Restatement sets forth several instances in which indemnity is granted under this principle, including in relevant part: (1) where "[t]he indemnitee acted pursuant to directions of the indemnitor and reasonably believed the directions to be lawful; (2) "[t]he indemnitee was induced to act by a misrepresentation on the part of the indemnitor, upon which [the indemnitee] justifiably relied"; (3) "[t]he indemnitor…performed defective work upon land or buildings as a result of which both were liable to the third person, and the indemnitee innocently or negligently failed to discover the defects"; and (4) "[t]he indemnitor was under a duty to the indemnitee to protect him against the liability to the third person." *Id.* The underlying basis for indemnity is the presupposition that the indemnitee is not *in pari delicto* with the indemnitor. *Id.* at comments a, c ("[t]he unexpressed premise has been that indemnity should be granted in any factual situation in which, as between the parties themselves, it is just and fair that the indemnitor should bear the total responsibility, rather than to leave it on the indemnitee or to divide it proportionately between the parties by contribution"). "Thus, pure

common law indemnity is an equitable remedy available to one who is exposed to liability because of the active fault or negligence of another, but is without negligence or fault on his own part." Conger, *supra*, § 9:2 (citing *Houdaille Industries, Inc. v. Edwards*, 374 So. 2d 490, 492-93 (Fla. 1979) ("Indemnity can only be applied where the liability of the person seeking indemnity is solely constructive or derivative and only against one who, because of his act, has caused such constructive liability to be imposed"). *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. First National Bank of Little Rock, Arkansas*, 774 F.2d 909, 917 (8th Cir. 1985) (summarizing the examples in Restatement (Second) of Torts § 886B as follows: "In all of these situations, the indemnitee is liable as a matter of law but the loss is primarily caused by the indemnitor, not the indemnitee").

MWCC argues that it is entitled to summary judgment on this claim because Liberty essentially forsook its common law right to indemnity when it entered into the Indemnity Agreement. I disagree, and find, albeit narrowly, that where an indemnity agreement is silent as to an issue of indemnification, and the court, in giving due consideration to prevailing policy concerns, construes the silence in the principal's favor that the principal is not liable for the indemnity sought, the surety may resort to its common law rights to pursue indemnity from the principal. The salient question, then, is whether Liberty was passively or actively involved in the negligence that gave rise to the bad faith claim. *See Henningson, Durham & Richardson, Inc.*, 739 F.2d at 1346.

I find that MWCC has not carried its burden of proof as to whether the bad faith claim arose as a result of Liberty's active negligence. For instance, MWCC asserts that Double H. Masonry alleged "Liberty breached the duty of good faith and fair dealing in a number of

respects, including its alleged conscious 'failure to comply with its duties under the [B]ond,' failure to provide Double H with a copy of its investigative file, failure to independently and reasonably investigate Double H's claims and its denial of Double H's claims without a reasonable basis." [#1-379 at 7, ¶ 26]. Liberty responds in part that "Milender was steadfast in its insistence that Liberty deny the claim," [#1-400 at 9, ¶ 26]; and Liberty's representative, Mr. Medeiros, attests that on December 5, 2014, he wrote to Double H. Masonry to confirm receipt of the notice of claim and to request that Double H. Masonry "provide additional documents to Liberty to allow Liberty to complete its investigation." [#1-377 at ¶¶ 9-10]. Double H. Masonry initiated the South Dakota Action one month later, on January 9, 2015. [#1-1]. Notably, the South Dakota Action did not resolve the question of Liberty's liability. For these reasons, I must **DENY** MWCC's Cross Motion for Summary Judgment as to Liberty's second claim.

In addition to the second claim for Common Law Indemnification and the issue of damages associated with losses Liberty incurred in defending against Double H. Masonry's Bond claim, the following three claims remain: Injunctive Relief – Specific Performance against all Indemnitors; Injunctive Relief – *Quia Timet* Rights against Milender White and all Indemnitors; and Unjust Enrichment – Equitable Liens. *See* [#12]. The Parties shall proceed through the pretrial process with respect to the damages issue and these claims in accordance with the dates and deadlines as set forth in the Scheduling Order entered by the court on December 12, 2017.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that:

1. The Motion for Summary Judgment Against Third-Party Defendants [#17] is **DENIED IN PART and GRANTED IN PART**;

2. The Motion is **DENIED** as to Liberty's first claim for indemnity for losses incurred in defending against Double H. Masonry's bad faith claim;

3. The Motion is **GRANTED** as to liability with respect to Liberty's first claim for indemnity for losses incurred in defending against Double H. Masonry's Bond claim;

4. The Third Party Defendants' Cross Motion for Summary Judgment [#18] is **GRANTED IN PART and DENIED IN PART**;

5. The Motion is **GRANTED** as to Liberty's first claim for indemnity for losses incurred in defending against Double H. Masonry's bad faith claim; and

6. The Motion is **DENIED** as to Liberty's second claim for common law indemnity.

DATED:  December 13, 2017                    BY THE COURT:


                                             s/Nina Y. Wang_____
                                             Nina Y. Wang
                                             United States Magistrate Judge